Hearing, hearing, hearing. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Be seated, please. Good morning. Good morning. We have just one case here oral argument in this morning. And that is case number 24 dash 11280 P Mohammed Sharifi versus warden Holman correctional facility. Mr Schultz, you may begin when you're ready. Not quite sure where the microphone would be best. Fine. Does that work fine you're able to hear me without any difficulty. Thank you. Thank you. Good morning, your honor. May it please the court. My name is Matt Schultz, as you know, and it is my privilege to represent Mr Mohammed Sharifi in this matter. I'll get straight to it as I find courts appreciate it when we do and just go ahead and state that the issue before this court is whether the decision of the Alabama Court of Criminal Appeals or the ACCA. Regarding Mr Sharifi speedy trial constitutional speedy trial act violation was objectively unreasonable and or based upon unreasonable determinations of the facts. Looking at the record in this case, that is absolutely true for two global well two reasons, one of them globally, and that is that under Barker, of course, there are four factors as this court is well aware. However, if all of those factors, they all weigh different weights and sizes in each case, depending on the facts of the case. But if all four of those weigh on site on the side of Mr Sharifi, it is objectively unreasonable to find that the weight went in favor of the state. And I know that that is a bold statement, given that the state court found that two of the factors weighed against Mr Sharifi. But once again, the the state court's determinations on those two factors were themselves objectively unreasonable under Barker and were based upon unreasonable determinations of the facts. So I could start discussing those. Yes, it would be helpful if you identified specifically the unreasonable determinations of fact on which your argument is based. Yes. Thank you, Your Honor. If you look at the and there were some under all of them, but I would imagine that the court is most interested in talking about the reasons for the delay as well as the prejudice. So your brief identified two facts, as I understand. Number one was, quote, by far the vast majority of delays were based on the numerous and lengthy motions filed by the defense. And second quote, it is clear from the majority of the delays were due to the court's desire to make every resource available to Sharifi, Mr Sharifi, before he faced trial on the capital charges. Right? Yes, Your Honor. And I'll gladly address those right now. Why are those why is either of those unreasonable determinations such that we are required to review to know that? Thank you, Your Honor. Yes, both of both of those are unreasonable. And the second one sort of falls into two branches. But I'll go ahead and address the first first. Initially, the court basically mentioned that Mr Sharifi had filed one hundred and twenty three motions. And you're talking about that that contributed to the time. Number one, that did not contribute to actually any delays, which I'll get to a little bit later when I talk about some of the things that happened in 2003. But number two, it's it's the court did not point out that of those one hundred and twenty three motions. Number one, those happened over the course of five years. But number two, one out of every five of those motions were motions to compel discovery because the state was dragging its feet and not doing it. So whether whether the state and we're not here on whether the state complied with this discovery obligations or not, but having to litigate those things because the state contested some of these, they were it looks to me from the record. Some of those things were hotly contested about whether discovery was actually do whether when and where the the council was entitled to review the discovery. And even where the state laws litigating sort of the mechanism in which it was going to be disclosed. Those things take time, do they not? Those things do take time, your honor. And part of that can be coterminous in the amount of time that comes away. I don't want to be disingenuous with the court on that. However, the key point there is that the major discovery violations that took place actually did result in delays in major delays in Mr Sharifi's trial at the April. If you look at the April 18 and April 16 hearings relating of 2003, the trial was set for May of 2003. At that hearing, Mr Sharifi and his counsel were fully prepared to go forward with trial. However, because the state had again not provided discovery that they were required under the law and the court found in Mr Sharifi's favor that the state was in violation. And this was important information, information about ballistics and jail. Also, even if we just fast forwarding a little bit, even if we assume the one in five number that you've just laid out. So that still leaves my math's really terrible. But that still leaves probably over 100 motions when you include the ex parte motions that the court still had to do. That is a significant amount of pretrial litigation in a criminal case. To a certain extent, Your Honor. However, if you look at those at those motions, a huge majority of those were also just motions. Number one, that were granted by the court. The state only responded to 10 of that. I know, but counsel that the state that a the state didn't respond and be that they only responded to some and see that the court granted them doesn't mean that there's not delays incumbent upon that in the court where you ask. Let's give him one example. You're asking for funds to go travel somewhere that happened a lot in this case. Sure. A court having to do that still has to evaluate their factors and statutory requirements that have to be met in order to be able for a court to approve all of the expenditures that were sought by them. That all incorporates certain aspects of delay. Does it not? It does, Your Honor. However, I would point out two things on that. Even if the court were to consider that delay coterminous with me considering it, the Alabama courts did. And my question is whether that was reasonable. Yes. Well, but if you're it's unreasonable for them to think that that was a large period of time or that it actually effectuated any delay because the Alabama courts are able to determine because a the state court here denied the speedy trial motion for the same reasons. The ACCA simply is reviewing the record, and that's the facts we have. How is the state court not able to look at the record and be able to make a determination that this, in fact, did delay the trial significantly? Well, it's because of a misunderstanding of what happened at those April and October dates in April. I know you want to focus on this one period of time, but counsel, this is a five year case. And there are motions that were filed from day one all the way to on the eve of the trial. Motions were filed. You have to show that it's an unreasonable determination, which you still have not shown to me. OK. And in trying to answer that, it helps to parse out some of the different delays. Number one, there was an 18 month delay where not even partial discovery was was given. And of course, there is that. But number two, yes, there could have been coterminous delays with things that happened in the course of the trial and certain motions being filed. And with the competency evaluations, however, as of April 18 of 2003, the court accepted and all of the parties accepted that the competency evaluation issue was resolved. The actual quote is there were motions that have nothing to do with competency evaluations. Let me give you an example. In 2004, the case was set for trial. New counsel had to be appointed and a new counsel asked for more time specifically in order to go to Turkey to be able to interview the defendant's mother. And that led to the trial. Court said it had to evaluate it, end up having a hearing and end up denying some of that. But that ended up delaying the trial significantly to then 2005. However, your honor, with respect to that was also the fault of the state. And if you look at April 2003, I can very clearly show you that by the record. In April 18 of 2003, the state stated on the record, actually two days before that, that all discovery had been provided. Everything, including the DNA. They then had to. We're trying to delay the trial again, asking for a continue. Because they want counsel to anything I state. So I stated something that I read from the record and I'll repeat it. And then I want to ask you a specific question. Is anything that I said wrong? What happened was there was a 2004 trial. New counsel at your client's behest specifically said, I want to fire my attorneys. New counsel was appointed. New counsel asked for a new trial date, meaning to continue it themselves to push it into 2005. Because they wanted to interview the defendant's mother in Turkey that had to be litigated. Ultimately, it was denied. And then the trial was held at the beginning of 2005. Is anything I just said incorrect? That is that is correct. However, you're on. Tell me, tell me why, despite my being correct, that a trial that the state appellate court can't say based on that record that significant delays were caused by motion practice. And thank you for that answer to that question, Your Honor, because I think that clarifies where you're asking me to go on this. So if you look at that, the reason for that is that Mr. Sharifi and his mother were in the country and prepared to go forward with trial both in May on May 4 of 2003 and again in October of 2003. And those two trials were delayed based upon the state's egregious violations, not turning over a DNA report. That's not accurate. Were there not also delays caused by the request that your client had for mental evaluations? Actually, no, Your Honor, because by that point that had been fully resolved. If you look at the record at 11 to at 59 through 60, the court and all of the parties and then even the following year, the prosecutor clarified that at 11 for 37, that they were all on the same page. But counsel, then to Judge Alois' question, you're right that in 2003, ultimately, they said no. But then in 2004, the defendant comes back and then brings competency back up again. And actually, Your Honor. Am I right in what I just said? Truly, yes and no. Tell me the yes part first and then tell me the no part. Yes. Okay. They did discuss competency. And if Your Honor will look at the record at what the state and the district court cited, the state court didn't cite anything for that. The district court cited page 38 at 11 at 11 for. If you look at all of the surrounding area within there, what they were really talking about was that there was an initial competency evaluation that said he might be incompetent. There was a follow up by Dr. Najai that said that he was competent. The judges then switched and there was never a finding on the record as to competency. So counsel was saying he was trying to figure out what to do, whether to file a motion for a mistrial or what, in order to preserve that for appeal because there needed to be a ruling on the record. And the prosecutor even chimed in on that. So none of that actually effectuated any delays at that point. What do you make of counsel's concession? And I'm talking here about in 2004, the actual litigation on the speedy trial motion. So at some point there was a hearing in front of the judge. The judge heard argument from both sides, considered it and ultimately denied the speedy trial motion. During the course of those arguments, and I'm referring to docket entry 11-3 at page 43, where counsel for Mr. Sharifi said, quote, of course, there are delays incumbent with the motions that the defense files. In other words, the defendant himself is conceding that there were delays with regard to his motions. How can we say that it's an unreasonable determination where the defendant himself says that his motions were the cause of at least some delays in this case? Well, oftentimes that type of language is used very loosely. The delays, of course, would be coterminous with the other ones that were going on during that early period. Counsel, I don't think you've ever denied that some delay was caused by some motions filed by Mr. Sharifi. Am I wrong about that? Well, delay in the terms of let me put it this way. Time was was caused by motions filed by collapse while filing of those motions. Yes, Your Honor. However, there was actually no delay in any of the trials because the delay that took place in the May trial and the court found this. The trial court found this was totally the fault of the state for not providing the ballistic evidence that they had in their possession for years. And until we give you that, if there's evidence in the record that some delay was occasioned by things that Mr. Sharifi's counsel did, then how can we find the state court's findings unreasonable? I would say because it's unreasonable to say that that effectuated any delay because it didn't actually delay the trial. Nothing that Mr. Sharifi did delayed it because they were still completely prepared motion to continue. I mean, how is that? That is directly a delay in the trial. With respect, which motion to continue? Well, right. That's my point. But let me refer counsel. Let me refer specifically to the defense motion to continue in 2004. OK, the defense motion to continue in 2004. That goes back to Ms. Rari, to his mother being unavailable. I know that. But how is that not attributable to the defense where the defense is asking for the time? On that, I can state as an officer of the court, your honor, that the that the record, if you really look at it, demonstrates that that is not contributable to the to the defense. And if you look at simply, if you look at the hearing on April 18 of 2003, Mr. Tootin, his Mr. Sharifi's attorney even was warning the court, saying in these types of cases, especially with people with mental illnesses, capital cases, there's a tremendous amount of stress. If we're making promises to our clients that we're going to get speedy trials and things like that, that that can cause serious problems in a relationship. The court nonetheless granted the continuance. And then six months later, the state, after having two days before that, the state said, you have everything that we have, including the DNA evidence. But then six months later, two weeks before trial, they're saying, oh, we didn't provide you with the DNA. And so the defense motion for continuance had to do with taking the deposition of the defendant or seeking to take the deposition of the defendant's mother. Yes, but the defendant, but the defendant's mother would have been in town during both of those trials. I know the counsel, whether that there was discovery violation or not, that caused that separate and apart from it being attributable to the defendant, that he sought more time to do something. Right. Well, but he the only reason he sought more time to do that is because it was important to his trial, particularly to his sentencing. And that gets to prejudice. And whether it was reasonable or not, I understand that they wanted to seek it. I think I have some questions about that if we want to get there. But but again, if you said that it's not attributable to the defense, the defense specifically asked for a new trial that caused about a six month delay. But when that happened, that was only because of what the state had done. It was the state. What about the motion to fire his counsel and get new counsel? And that's what I wanted to get to. Yes. Good question, Your Honor. That motion, if you look at the timing of that, Mr. Sharifi and his counsel were getting along fine in April. They were ready to go forward to the May trial that then gets continued over Mr. Sharifi. OK, let me just go a little bit. I've read the entire request. That was the basis. It's attached to your original petition. I think it's at one dash one. Yes. And I've read every one of the paragraphs in there. And while there are stray references, the ones you cut and paste, like the one or two lines you cut and paste in your brief, the vast majority of is nothing to do with delay. Let me just read a couple paragraphs of it. Paragraph one. He was he was mad that his counsel didn't respond to letters and calls. Paragraph two. They failed to adequately investigate the facts. Paragraph three. He lied. They lied to me about the fact of a report dealing with the Tennessee River and having filed a habeas corpus motion. Paragraph four was that he they had lied to the court about presence at the hearing and did not discuss motions with him before they were they were done. Paragraph five, that there was a no official interpreter. Paragraph six did not tell how not tell him what did not tell him what happened at hearings and so on and so forth. I can give you paragraph seven, nine, 10, 11, 12, 13, 14. Nothing to do with with delay. He's seeking a new attorney because he wants a new attorney for various reasons that have nothing to do with delay. Right. Actually, your honor, I would have to say that's not true. This was an individual who on the record right from the start, there were indications that he was hypomaniac, that he was on antipsychotic medication. His own counsel had warned in the April hearing that this type of thing could happen with these sorts of continuous delays. And then the timing of this, he files this five weeks after that second delay, when the state again did not produce the DNA evidence and the two portions that really that I did cut and paste from the brief. We need paragraph 14. What do we make of docket entry 11 dash 13 at page 67? And this is the report of Dr. Nagy, which the court had before it. The ACC had before it and the district court had before it that, quote, Mr. Sharifi was determined to intentionally avoid trial based upon the assumption that if he would be found incompetent to stand trial, they would send him back here. And that is to the state hospital. And then that same paragraph that he indicated that he is that that that it's indicated that he is malingering and has set his mind on avoiding trial and being found incompetent to stand trial. Could the trial court not and the ACCA not based on this record find that he sought to withdraw his counsel because he was seeking to avoid trial, having nothing to do with any sort of delays? Actually, no, your honor, because the record would not support that because I just read to you the record. How does the record not support that? Well, because at the April 18 hearing, Mr. Sharifi's and his counsel agreed that they were not pursuing that mental health, mental health defense. He he's trying. He's doing everything he can to avoid trial. My strategy is to avoid. He's chronically malingering. Well, his his strategy. He never said his strategy was to to cause delay. He said his strategy was to be found incompetent. And and yes, as I admitted before, that is coterminous. You know, with other with some of the other delays, you can't blame the mental health for for this being a cause in the breakdown of the relationship because of the delay. And then hide and say this isn't a mental health case because he's not claiming incompetence. He was using his mental health on purpose to avoid trial. That is what the report says. And I guess based on that record, how is the ACCA not wrong to say that this motion practice, including his motion to withdraw, including last minute continuances, is not part of that strategy for two reasons. Number one, because he was it's a little bit different. He was saying his his strategy was to be found incompetent. Now, that obviously failed. However, by the time that all of that was resolved again by April 18, 2003, the mental competence issue is now resolved, according to the court and all the parties. So all of the actual so that did not actually effectuate any delay. It did cause time, but it did not delay the trial because his his attorneys stated at that that hearing that they were ready to go forward with trial. OK, so then his mental health has nothing to do with his later motion to withdraw because that had been resolved, as you said. So I just read to you five paragraphs. I can read to you another 10 more where he states I want new attorneys for reasons that have nothing to do with with any sort of delay. Correct. There were a number of portions of that. It was a very long pleading. He also did about 20 paragraphs. And there are, I think, two, maybe three references to delay. The rest of them have to do with things that people, clients complain about their attorneys. Well, contacting me, not communicating with me, not telling me what's going on with the case, misrepresenting things to me that have nothing to do with delay. Right. Well, but but the ones that did have to do with the Speedy Trial Act were underlined. And counsel, if we're doing a percentage, 95, 98 percent have nothing to do with delay. Well, when they're underlining it and highlighting it and saying that that was a big lie, am I right? Am I right to say that 95 to 98 percent of it had nothing to do with delay? I don't know that specifically, but 80 percent and probably close to that. But isn't it OK for the then isn't it OK then for the court to say 90 percent of this? Not all of it, but the vast majority of this had to do with non delay reasons based on motion practice from the defense. I think that's still objectively unreasonable. You just you just agreed with me that 90 percent was based on non delay. But the appellate court is telling you that the vast majority, but not all, but the vast majority has to do with non delay. But 90 percent of it was also based on a lot of gibberish and a lot of things that did not make a whole lot of sense. But I will say I read it. First of all, his handwriting is excellent. And second of all, someone who has bad handwriting. But it's completely coherent. He's upset that his attorneys are not doing things that he explicitly asks. I mean, whether he's right or not is a separate point. But he's telling that to the court. And by the way, the court granted the motion to the court. There obviously was something to it. And there was. But part of that had to do with the fact that his counsel had warned the court in April that these continuances were going to cause this type of breakdown in the relationship. And then after another continuance in October, literally five weeks later, that's when this this comes through. That's when the bar complaints are all of a sudden filed. So it's the timing of it that demonstrates that that at the very least was a significant contributing factor to setting this individual who was on antipsychotic medication and and did have severe mental illnesses off. And he was clearly very, very upset. Also, that would take takes us back to his initial plea for a speedy trial in this case. I mean, the state court just said, yes, he asserted the right. But they didn't mention the fact that that Barker said that that is the most important factor. And Mr. Sharifi articulated that very vociferously and early. And he stated that he would rather be put to death than to lose his right to his. At the court also in looking at some of the reasons for the delays, they listed a number of the things that Mr. Sharifi filed. Two of the things, two of the filings were motions for speedy trial. And that may have just been sort of sloppy. And I do understand that the state courts are overworked. But nonetheless, that is objectively unreasonable in and of itself. Under Barker, the assertion of the right again is the most important. So you can't hold it against the state court filed. The state court valued that right or in weighing it. Weigh that in favor of your client. They did, but then they turned around and waited against him in the number of filings that he filed. And they did that directly by listing them. Well, it just listed a bunch of them. It didn't say that it didn't attribute one to each one. But it just listed all the motions and then said, hey, there are 150 of these when you add in the ex partes. Well, it listed a number of them and then it had a footnote to that effect. But it was sort of blaming him for all of those. But it specifically listed the two. Can you show me where it says we blame the defendant for filing motions for speedy trial? Can you show me that part of the ACCA? It's simply that they list those underneath that reason. What it said was that it made the finding and then supported that finding by listing a bunch of motions. And you've agreed that only a fifth of them had to do with delay based reasons. Four fifths of them had to do with legitimate things that were being asked for by counsel for their client. Well, other filings did have to do with delay based reasons as far as having ex parte communications with the court and that sort of thing. But in terms of actual motions for discovery violation. Yes, one out of five. Also, the state just so you know, the state only responded to about 10 of those motions and they were all less than two pages. The longest motion Mr. Sharifi filed was actually his motion to dismiss based upon the Speedy Trial Act violation. So really, you know what this all ultimately comes down to is those dates in the trial dates in May and October of 2003. According to the court, according to all the parties, Mr. Sharifi and his attorney were ready to go forward with both of those trials. And had he done so, he would not have lost the opportunity to have his mother present to support him in the trial. The prosecutor even even talked about the fact that that didn't your didn't your mother make didn't your wife when he was speaking to the father to the father? Didn't your wife make some of these phone calls? But she was unavailable and she was also unavailable. You know, the ABA says that that individuals that need to do mitigation work right from the point of conception. And I don't know any court really that could not take judicial notice of the fact that having a mother present at a sentencing, a sentencing that was literally one vote shy of being a hung jury. This was it was not a unanimous decision. It was ten to two that the presence of a mother could not have impacted the trial. And the other major point here. Oh, I'm sorry. Running out of time. May I finish one sentence? OK. The other major point is simply that prejudice here is not the same kind of prejudice that we're looking at in like IAC claims or Brady claims. It's merely the possibility that the defense may have been impaired. And so that's a vastly lower standard. But I can talk about that more. Thank you. Yes. You've saved five minutes for rebuttal, Mr. Schultz. Thank you, Your Honor. Mr. Overing. May it please the court. Robert Overing for the state of Alabama. Sharifi tried to gain the system to escape punishment for murdering Sarah Smith and Derek Brown. He feigned incompetence by lying to doctors about his mental health and making performative outbursts in court. He filed numerous frivolous motions and requested hearings on pretty much all of them. He forced his attorneys to withdraw. He concocted false alibis, tried to fabricate evidence and pick discovery fights that had no bearing on his defense. Yes, a defendant has a right to use the tools that the law affords him, even if his claims are designed to gain the system. But he cannot then blame that system for taking his efforts seriously. His speedy trial claim fails for two reasons. First, Sharifi caused much of the delay. And second, the time to trial did not prejudice him. I'd like to start on prejudice because we've talked a lot about the reasons for delay this morning. And the Supreme Court has said that impairment to the defense is the most serious interest at stake. Here, there was no impairment. Are you talking about the prejudice you're talking about? Are you talking about a Brecht prejudice standard, meaning assuming there was a speedy trial violation, there's no Brecht injury? Are you talking about the fourth prong of the Barker test? Right now, I'm talking about the fourth prong of Barker. I don't want to tell you what to do, counsel, but you heard what we spent the vast majority of time talking about with your opposing counsel. It would be very helpful if we could focus on the state court's findings, specifically the finding regarding the vast majority finding and the secondary finding that the delays were caused because the court was, I'll paraphrase, bending over backwards to protect the constitutional rights of the defendant. Okay. And maybe if we have time, we'll get back to it. But I'll note that it is a finding of the CCA entitled to deference. And the district court also found that there was effectively no prejudice here. And so that's an independent reason to affirm. But we can start on the reasons for delay. And I think that the big picture is that there is no finding of bad faith or intentional delay on the part of the state. There is no evidence that the state caused delay for tactical advantage. Does that matter? In other words, as I understand it, this isn't an intent-based argument. It is simply, like, who is the cause of the delay, which is where I thought you started your argument with. So let's say I agree with you that the state didn't intentionally or tactically delay, but I do think that it's the state's fault. Wouldn't that still be incorrect for the state appellate court to say that the vast majority of the delay was caused by the defendant's motion practice? That's correct. But it wouldn't be a reason to give relief because the ultimate decision that the state court reached would not be one that was contrary to law. And it could be a reason to affirm. That would go to de novo review, would it not? I mean, that's really where we're fighting over. But why don't you focus on why the findings that I isolated at the beginning and that we talked about with your opposing counsel were, in fact, reasonable and not unreasonable determinations. Right. So I think I heard the word concurrent cause over and over. And at best, for Sharifi, both sides contributed to pretrial litigation and delay. But this argument rests on a principle that those concurrent causes should be taxed against the state. And I haven't heard a legal authority, at least certainly not clearly established law by the Supreme Court about what this court should do in that scenario. I think probably the closest case on point is Vermont versus Berlin. But that case came a year after the CCA's decision. And so it can't be a grounds for relief under EDPA. The biggest cause of the delay were the motions. There are over 150 of them. And of course, it's Sharifi's right to file motions. But it still takes time to respond and resolve them. What do we make of the fact? So two things there. One is, and your opposing counsel is exactly right, it looks like the state only responded, at least in writing, to very few of them. I know there was oral presentations, and I don't blame the state for that. But the state didn't respond in writing to a lot of them. But the second thing is, what your opposing counsel is saying is at least a good chunk of those motions had to do with things that the state was doing, which caused us to file it. And it's bad. It isn't right for the state courts to attribute those motions to delay for the defendant, where it was the state that caused me to file it. So you can't withhold discovery, make me file a motion to compel, and then state it's my fault I filed the motion to compel. No, it's your fault that you withheld the discovery. That's the argument. And I think that has an intuitive appeal. I'll first start on the fact that the state didn't respond to all of them. The state did address many or most of them at hearings. I think there were over 12 hearings in this case. And that contributed to a lot of the delay, because even if the state doesn't have to write a brief, it has to prepare for a hearing, it has to get on the court's calendar. And it was hard to get on the court's calendar in this case, because Sharifi had demanded that he be present at every hearing, which is his right, but also that he have a Farsi interpreter. And there's evidence in the record that he spoke English basically fluently, including the parts of his bar complaint that we just read. And so there was a there were scheduling conflicts. There were the time that it takes the court to resolve those motions and even simple motions. Two page motions may require a lot of time. For example, you can file a two page motion to determine competency, and it might take the court several months to decide what to do with that. And we can't go to trial. I think you're answering Judge Luck's question, which was, if it was the state's activity that caused Mr. Sharifi's counsel to have to file discovery motions, how is that attributable to anyone but the state? Right. And I'll get to the discovery parts of it. I think it's pretty difficult to parse because there are a lot of different discovery disputes in this case. And some sometimes the state had legitimate objections. For example, Sharifi wanted his briefcase and the state said, well, no, this is evidence. And it's certainly evidence so long as you're pressing a mental state defense. And so we need to maintain a chain of custody. And then there are ordinary hiccups that happen in discovery, like there's a missing page from a police report or they say that it took 76 days instead of 60 days to produce some discovery. Sometimes it looks like the state was dragging its feet or at least wasn't being as responsive as it could have. But other times it's it looks more like Sharifi's counsel is waiting till the last minute to raise these discovery disputes. So take, for example, the complaint about the delay with ballistics evidence. And they knew that the state had ballistics evidence from the very beginning of the case. But they took till the very end of 2002 for the defense to move for their own expert. And then there was there were more motions in 2003. And then the expert says, well, I want to use the state's equipment, the forensics department's equipment to run the same tests. And the forensics department said, no, we're not going to let you do that because of the integrity of our lab and other things. And then we get to two weeks before the first trial date. And the expert says, well, are there pictures? And the prosecutor says, I don't know if there are pictures. We have the ballistics report. And that's what we gave you. And we can ask if there are pictures. And at that point, the defense moves to suppress all the ballistics evidence. And the court gives the state the choice. Do you want to have your ballistics evidence? Or do you want to have the trial now? And the state says, well, we want to have our ballistics evidence. Is that delay attributable to the state? I mean, both sides are saying I'm not an Alabama criminal rule procedure expert. There was a time when I was a member of the Alabama bar, but it's been some time. Don't the rules of Alabama criminal procedure require that any information, including any tangible photographs and things like that, be turned over as part of discovery in the case? I think that's the general rule. And there's a monk order entered, which requires a very fulsome discovery. And under rule 16. But there are some things that, you know, for example, an expert makes a report and may have some personal notes that could go along with the report. And maybe that's discoverable, but maybe it's not something that was in the prosecutor's possession in the first instance and knew had to be. I mean, this gets into larger sort of Brady issues about prosecution team. But I think it's fair that when the Alabama Department of Law Enforcement is the one that conducts the discovery or the test, that that is within the prosecution team. But I will admit that that is not an easy call. Let me ask you this. I'm interested in the first 17 months. It is very odd to me that someone is arrested and I know there was a delay because of extradition proceedings, but he's in custody, as I understand it. I think it's the beginning of 2000. And he's not indicted on these charges or what is ultimately these charges until 17 months later. And there doesn't seem to be much going on in the case. Can you explain that to me? I can't explain it because there's not much in the record about exactly all the steps and investigatively that that were being taken. I mean, I on the speedy trial motion, I understand. But how is that even allowed? Like what? Again, what rule of Alabama criminal procedure allows you to hold someone without charge? Did he waive ability to indict? Did he waive charges? Was he trying to I know sometimes in the state of Florida to waive death? There's a preliminary investigation will present mitigating evidence to avoid a capital charge. What was going on there? The record on this is somewhat sparse. I think there was a lot to do investigatively because there's a complex double murder and it involved multiple jurisdictions, not just going to California to interview and to find witnesses and evidence, but also multiple authorities because the FBI was involved and there were other federal authorities, INS, who had an interest in the case. And so I think it was just one of these complex cases where they needed time to develop evidence. And what do we do at that time? I mean, so let's how is that at all attributable? And I'm not saying that that would get you that would violate the constitutional right to speedy trial. But how is that attributable to the defense? Well, I think to have a successful Barker claim, I'm not saying it's attributable to the defense, but they have to show, if not bad faith or intentional delay, at least negligence on the part of the state. And you see these cases like Doggett where there's eight and a half years and it's not clear what the government is is doing during that time at all. And here there's no nothing in the state record to support that there is negligence during that time. And so if it weighs against the state, it weighs only lightly. And the and it can be counterbalanced on the state side of the ledger by all of the delay that Sharifi caused. And so I think I haven't gotten much into that. But the attempts to feign incompetence here should weigh very heavily against Sharifi. And they say he says in the blue brief that it was a minimal portion of the delay. But this was his strategy from the beginning and all the way through fall of 2004 when they move for a mistrial on competence grounds. And can you tell me if I'm correct, because I thought and maybe I have it wrong, but I had a reference to the incompetency period was from 2001, April 2001, through June of 2004. Is that is that accurate? I think in page 43 of the district court's opinion, the court writes until at least June 2004 and possibly a few months longer. And that's probably a reference to that September motion for a mistrial. And your opposing counsel tries to explain that when he was up here, what he said is that had to do with the fact that there was a different judge. And for some reason, the actual order of competency, in other words. So the way the way again, the state of Florida is more my reference, but where there is an invocation of the right to incompetency. You're sort of in like this stasis period. There has to be an evaluation done and then there has to be an order entered, finding the person to be competent and then the case can move forward. It sounds like Alabama works similarly to that. It sounds like that order, for whatever reason, wasn't entered. And that's the point at which he moved. Was that the reason why he came up in 2004? Well, I think, yes, the argument had shifted by September 2004, but it was still one of a big, important issue that the court needed to resolve and be sure of before going to trial. And and if I recall from that motion, I mean, I think it's a motion for a mistrial. And so it wasn't just could you enter an order on the record, but it was something that would dismiss the indictment. And even those three months from June to September, even if those ones don't count on this ground, there were still a lot of other pending motions that had to be resolved. And so the district court here was right to find that the record establishes that those competency related disputes delayed the case for years. I'm sure if he tries to blame the state for needing a mental evaluation, but the evidence is that this was his strategy from the beginning. There's no evidence that his pretrial incarceration changed his strategy. And there's just no doubt that he set out to fake incompetency because he told the doctors that. And four doctors tested him and concluded that he was deliberately feigning incompetence. He was diagnosed with malingering under the DSM four. And the forensic examiner at that time said that he was logical, goal directed, rational, and he spoke English fluently. But then in other interviews, he's claiming he has no memory of the time of the crime. He can't understand legal terms like trial. He says he can't understand English and that he can't do simple arithmetic. He said after two or three times being found incompetent, they'll have to keep me in a mental hospital. That's my strategy. And so this did contribute to delay. Proximate goal was to be found incompetent. These these motions took months to resolve. Other important motions, like a motion to dismiss based on the Vienna Convention, filed in 2003, took the court over a year to resolve. Both sides agreed that those motions would require briefing and testimony. Sharifi also moved for a separate hearing and a ruling on every one of his motions, saying that their resolution would greatly impact the defense's trial strategy. And the court ultimately granted that motion. And that's why there were over 12 motions hearings in this case. And so it's not true that even the majority of them had to do with these discovery fights which are disputed. And even if you get into each of these individual disputes on discovery, the state came back and had good answers for a lot of the delays. For example, on the DNA report, it was an error from the Department of Forensics. When they responded to the subpoena in 2003, they omitted the DNA report and the defense realized it's missing in August 2003. And so the defense moves to suppress the DNA evidence. And the state says, well, hold on, we'll give you the DNA evidence. And it's at that point that they say, well, we want to do an independent test of the DNA evidence. And so the court again gives the prosecution the choice. Do you want to lose your DNA evidence or do you want to have a continuance? And so can that be attributed to one side or the other? I mean, both sides are making motions. Obviously, there was an error made, but it's not the type of bad faith or intentional delay on the part of the state for a tactical advantage. And there is no prejudice stemming from a lot of these individual discovery fights because they had no bearing on the defense strategy. They had no independent DNA theory. They had no independent theory on the ballistics. They weren't contesting the cause of death. I'm not sure you can look at prejudice in that fine of a scope. In other words, you don't know, a defendant doesn't know what defense he's going to have until he's able to see the entire discovery. In other words, he doesn't know he has a DNA defense unless the report comes back and says it's only a one in three match as opposed to one in 58 billion match. One, you might want to investigate a little bit further and get your own expert. The other, you might want to bury as far down as you can. So I don't think that's a fair way to review prejudice. I think there may be reasons why there's no prejudice here, but that doesn't seem to be the best argument for the state. I think that's true as a general matter. But if that were enough, that sounds more like a presumption of prejudice. I want to get all the evidence I want to. The problem is you do get presumed prejudice under the Barker factors if the first three weigh in favor of the defense. And so we do at that point presume prejudice, which is where I wanted to go with you after discussing the delay part. Because if we do find that the state is responsible or that at least there is a that the state court is wrong in its determination that the vast majority of the delay was attributable to the motion practice. Then then we get into conversations of whether we should weigh some of this in favor of the defense, even lightly. And then we get in the conversation to presume prejudice. Right. Well, I think it's not quite right that if the if a defendant wins the first three factors, then prejudice is presumed. Most recently in the Vargas case, we cite the court declines to excuse the obligation to show prejudice, saying that that might be appropriate when the government's conduct has been most reprehensible or engaged in inexcusable conduct. And so that's where intent comes into play. Right. And and so Doggett is a good example of this, where it was equitable because it was just going to be impossible after a decade for the defendant to show any prejudice here. We don't see those kinds of equities at stake because they haven't made a strong proffer of what that evidence would have been. How would the strategy there has to be more than just an allegation of, well, the trail went cold, the leads dry. They do. So as I read their brief, they point to two things for prejudice. Number one was the mother. I think your friend on the other side discussed that a lot while he was up here. The other which he didn't discuss was the fact that apparently the the examiner conducted the autopsy, had a psychological breakdown and so wasn't available to testify and was done by a substitute person that deprived them of the opportunity to examine that witness. Why are those things not prejudicial in some way? So the loss of a witness is exactly the type of thing that speedy trial is designed to prevent. But in this case, it wouldn't have made a difference because they had no strategy at trial that dealt with the autopsy. They weren't contesting the cause of death because the whole strategy was an alibi. But when when the death happened does seem to be an issue, was it not? The timeline seems really relevant here. The timeline is relevant, but they didn't have a different theory from the autopsy evidence that would support a specific date on which the murder occurred. And they say as much in closing, they say we're not contesting. You know, they just keep saying, we don't know what happened. We don't know when we don't know the answer to all these questions. But ultimately, they weren't contesting the cause of death. And it didn't take an expert to opine on the cause of death because the victims had bullets in their skulls. Dr. Glenn's absence also cut both ways because he's a witness for the government. And so is so pretty. The autopsy was the part in which essentially was testified to by the substitute witness essentially supported the state's theory. I mean, that's that by depriving them of the witness, you deprive of the believability of that witness or the credibility of that witness, which went in part to the timeline, which was relevant here. Right. At a high level, but I still think they've got to do more to show. Well, here's what we would have done. Here's what our alternative theory was that they were actually killed in January or in late December. Well, after he had left, let's talk about the mother. So is either. So the theory was I didn't do it. I wasn't there. I was in California. And in part, it was the victim here or the female victim here actually spoke to the defendant's parents during the time when the state's theory was that she was murdered between that window from when she was reported missing to from when the confrontation happened, I think, is on the 13th or so. The the the mother would have provided more alibi testimony, which, you know. Well, I think it's I think it's unclear, because at least in the direct appeal brief, this issue wasn't really exhausted. All they said is she would have provided exculpatory testimony. So we have findings about what the mother would have said. And it's not a case like Doggett, where the mother is gone. And so there is some inequity here. They they could have made a more robust proffer at the time. They could have tried to depose her before she was deported. I think it was reasonable for the state courts to say it's not taxed against the state that she overstayed her visas. If she hadn't done that, she might have been back in the country to testify. And the state has no duty to ensure that the defense witnesses abide by immigration laws. It's the burden of the claimant to show the availability of that witness. And so on the guilt phase, I don't think we have a whole lot to go on. The father provided the same account. And so the prejudice, if any, is minimal because the evidence was cumulative. And then on on mitigation, again, this claim was hardly raised. It was just in the state courts that there would be good mitigation evidence. Now, it's developed a little bit more that she would have talked about her childhood mental illness and the severe effect of the Iraq war. But there still isn't a strong proffer there. And there's a finding that the trial council made a strategic decision to focus on the theme of unfairness, that they couldn't go to Iran, they couldn't get mitigation. And also to note, Sharifi was not cooperative and he made a fulsome mitigation case impossible here. He spoke to the mitigation expert for half an hour and he said that he was unable to remember anything of consequence about his life. So it's hard to see how that would have been a viable strategy. He often refused to discuss the facts of the case with his lawyers. And then from a more legal angle, I'm not sure that sentencing prejudice should count for a speedy trial clause violation, which is focused on impairment to the defense at trial. In this case, it would be a windfall for Sharifi if he proved if he can't prove there's any prejudice to the guilt phase. And then he proved some prejudice at the sentencing phase. Then he gets his conviction vacated because that's the only remedy for a speedy trial clause violation. And I don't think that would be the equitable outcome. And it's not what Barker is trying to do. That doesn't have to be. I mean, you're right that that is traditionally what is done. But I don't see why that has to be done. In other words, if the habeas writ can simply issue first new sentencing rather than a new a new trial, even for Barker violation. Let's take a defendant who pled guilty but only wanted a sentencing hearing. That would really be the only remedy. And we wouldn't vacate the whole conviction because of the speedy trial. At that point, it would only be the sentencing. Right. I think the Supreme Court has said that the only remedy for a speedy trial violation is vacator of the conviction. And Betterman versus Montana is a case we cite in our brief for a different proposition. But there's some discussion here about how it's totally focused on the guilt phase. Now, whether that changes when we're on collateral review and habeas, I don't know. It's perhaps unsettled. I'm not aware of any authority in this circuit. But it's certainly not clearly established law at the time of the CCA decision that they need to consider this sort of elliptical argument for sentencing prejudice. And so there there's no no significant prejudice from those two witnesses and in large part because the evidence of his guilt was overwhelming. He bought the murder weapon a week before the murders he had in his possession at the time of the arrest. The forensics matched the bullets in the victims to the gun. He had Sarah's blood in his car and in her apartment. He had Brown's license plate and driver's license in his person, and he couldn't explain any of these things. But the prejudice is not a reasonable probability of a different result test. You agree it is. Is there a possibility of impairment of defense? Right. I'm not aware that the Supreme Court has defined the Barker four factor so narrowly. I think it matters whether the prejudice to the defense's strategy would have been a strategy that they could have actually pursued and used. I mean, if the state delayed and turned something over that had no bearing on anything in the case, then then I don't think it matters. And the Supreme Court has used language in this court has, for example, in the Vargas case. One of the things this court found important was the fact that the defendant was here. Didn't Barker say in assessing prejudice, we review three factors, oppressive pretrial incarceration, minimizing anxiety and concern for the accused. And third, which it said is the most serious and the most important to limit the possibility that the defense will be impaired. And isn't that the test? When this court is applied, Barker, it has looked at whether the defendant actually had a vile, a viable defense or some merit in the argument that delay somehow foreclosed. And so Vargas talks about the fact that drug transactions were being recorded. And, yes, he ultimately stipulated to the elements of the offense. So taking a guilty plea, I think, helped our point of view on this, because if you take a guilty plea, then you had no defense anyway. And so if the court can take that into account, then I think prejudice is a wider inquiry than your honor is suggesting. But I'm really reading Barker, but. OK, so he he had motive, too, because his wife was divorcing him, trying to get him deported. They got into a fight. The police were called. She changed the locks. He said, I'll be back. And all he had was an alibi, which he tried, but didn't have anything to back up. He tried to fake having mental problems and none of the delay in this case would have made any difference. The trial could have happened as speedily as possible, and he still would have been found guilty because of this overwhelming evidence that he murdered Sarah Smith and Derrick Brown. I'd like to briefly touch on the assertion of the right and the legal principle that we rely on here is that a speedy trial claim can be denied if the defendant acts in ways that are inconsistent with his demand for a speedy trial. And it's evident he didn't want to go to trial. He wanted to be found incompetent. He said even if the state's psychiatrist finds him competent, that his lawyer would hire an outside psychiatrist to evaluate him. He said, if they try me, I will stand and hit my lawyer and scream at the judge. I will grab a chair and cause problems. How can they find me incompetent? And that's exactly what he did in hearings. He threw out the transcript. He's he's bursting out. He's saying, your honor, I'm a gorilla. I need bananas. And he later wrote to counsel. Trial is my last option. My first option was competency. This is not a man who sincerely wanted to go to trial, who consistently and genuinely pressed his right to do so. And so the decision of the CCA was reasonable on factors two, three and four weighing in favor of the state. Before you before you sit down, Mr. Overing, I think you are concluding. I want to ask you about the very last section of your brief, which is entitled Sharifi is guilty of capital murder. So law and justice do not demand that the writ be granted. And in that section, you're saying that the court should deny relief where the petitioner does not dispute his guilt. I'm speaking only for myself here. I've not discussed this with the panel, but I personally find that at best unhelpful and actually sort of offensive, because you well know that criminal defendants are entitled to rights guaranteed by the Constitution. We are a court of law. We have to enforce those rights, obviously consistent with our statutory authority and with our case law. You suggest in that section that perhaps this is a frivolous case. A judge of this court has granted a certificate of appeal ability. We don't think the case is frivolous. So I just like to explain why that section is included and and whether that has any relevance to the discussion we're having today. Well, I didn't mean to demean the order on the COA at all. We are not saying that it's OK to violate constitutional rights. This is a procedural argument that when we're here 20, 30, sometimes 40 years after the fact that the federal power should be more limited to extreme malfunctions in the state criminal justice system. That's not what we see here. And it's not what we see in a lot of cases that are briefed and argued in the 11th Circuit. And so we think the court should adopt a doctrine that would avoid the trivialization of the writ that would reserve it for those cases of extreme malfunction. That's the Supreme Court's language in Richter and Brown versus Davenport. Are you saying that this argument doesn't really apply to this case? It's a policy argument that you're making. No, I think it does apply to this case, Your Honor, because there is no serious argument that he's guilty. And so the equities federal habeas powers, ultimately an exercise of equitable discretion, do not weigh in his favor. Thank you. Rebuttal. Thank you, Your Honor. First, I would just address that very quickly and just dispose of that. But of what you were just asking, I would point out that the state's arguments in this are so off the wall, especially in a case involving a speedy trial act violation. Because in Barker itself and in following cases such as Doggett, the Supreme Court even made it very, very clear that prejudice is not even required. I know, but counsel, those are not habeas cases with a DIPA deference. And I think I will tell you, I've read I've seen that part of the state's brief, I think, three or four times now. It seems to be something they cut and paste into their briefs. I understand it to be an argument that even under a DIPA and under and under the habeas statutes, it is a may, not a must. And in the exercise of our discretion, these are things we should consider in terms of justice and fairness. But I think Judge Pryor asked some good points. But if I were you, I'd definitely get to the meat of what we actually were discussing. I will do that, sir. And that's a good idea. Thank you. I would point out a couple of other matters. First off, counsel mentioned that this was at best negligence. I was at worst negligence. This was at best gross negligence. If you look back at the April and October hearings, you've got the state on April 16 assuring the court that they have turned over everything. They have turned over all of the DNA evidence and all of that. They then even referenced Nancy Jones in that same hearing. And they say, well, I guess you're complaining that we didn't give you that information either. And Mr. Sharifi's counsel says, well, yes, we obviously want that, too. And so they want everything there. Then two days later, the court again is assured that they have everything. But they grant the continuance because the ballistics evidence wasn't there. But then at six months later, the state is moving for a continuance again. Or the court is giving them an option of a continuance or suppressing the evidence because they didn't provide the DNA report that they had in their possession when they were even talking about it in April. And they had already had in their possession since November of the prior year. So I think a lot of this also comes down to and with respect to counsel, much of the language that he was using when it came to prejudice, he really was using language that had to do with whether there was a reasonable probability that the outcome of the trial would have been different. And you read Barker the way that I read it. I do, Your Honor. At least from what I understood, Barker and Barker itself is very clear. It has to mean that that this is a much lower standard of prejudice because prejudice isn't even required. But then especially the language that Barker uses. But in Vargas, didn't we have a discussion, Judge Marcus, about the fact that you have to at least show some prejudice as a result of the delay? And that there has to be the possibility that the defense will be impaired because of the inability of the defendant to adequately prepare his case, which means that you have to have some kind of prejudice to how you're going to present the evidence, your legal defenses, your strategy. It has to have some kind of delay or some prejudice on your preparation for the defense. Yes. And what exactly was that here? Yes, Your Honor. Here, so the standard is, was there a possibility that the defense could have been impaired? And in here, we have the Supreme Court said if witnesses become available or become unavailable, the prejudice is obvious. Here we have two witnesses. We don't have any witnesses to the crime. You're just talking about mitigation, correct? Well, not just mitigation. The state did ask Mr. Sharifi questions about whether his wife made phone calls and things of that nature. And they said that they did not present anything to the state about that. They actually did in a motion as to things that she could have testified to. However, even in mitigation, again, that's very important, as well as her support during the trial, because the Supreme Court talks about things like that, the difficulties that people have in prison. And then he also lost, of course, as Judge Luck pointed out, the opportunity. And as the way that this court even discussed in discussing Crawford and violations of confrontation clause, he lost the opportunity to challenge potential errors, omissions, mistakes, or bias. The state's making it out as if we have to be able to show exactly what would have been lost there. But that's not confrontation clause analysis and certainly not what Antonin Scalia thought in Crawford. That was an important opportunity that was lost. And it was lost purely because Dr. Glenn became incompetent right before the ultimate trial took place. And so he would have been available for both the May and October trials, both of which Mr. Sharifi was completely prepared to go forward with, and both of which the court found the state in error in major discovery violations on which both caused the COA. In this case was not granted on the confrontation clause. That's correct, Your Honor. However, it was before the court in the briefing in the state court as well in terms of a fair presentation argument. Thank you to both counsel for your help with this case. Just a housekeeping announcement. We will take a 10 minute break and then we'll return to speak with the law students and younger lawyers who are in the audience today. With that, court is adjourned.